# In the United States Court of Federal Claims

No. 19-792C

(Filed Under Seal: July 12, 2019)

(Reissued: July 19, 2019)

| | |
|---|---|
| **ALASKA STRUCTURES, INC.,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **UNITED STATES,** ) <br> ) <br> **Defendant,** ) <br> ) <br> **and** ) <br> ) <br> **CALIFORNIA INDUSTRIAL** ) <br> **FACILITIES RESOURCES, INC.,** ) <br> ) <br> **Defendant-Intervenor.** ) <br> ) | Post-award bid protest; motion to complete or supplement the administrative record; procurement of a commercial item under streamlined procedures; FAR Parts 12 and 13; inconsistency between bid and product literature; required production of test results |

Richard J. Conway, Blank Rome LLP, Washington, D.C., for plaintiff.  With him on the briefs was Michael J. Montalbano, Blank Rome LLP, Washington, D.C.

John M. McAdams, III, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Christopher S. Cole and Lt. Col. Damund E. Williams, Air Force Legal Operations Agency, Department of the Air Force, Washington, D.C.

Paul F. Khoury, Wiley Rein LLP, Washington, D.C., for defendant-intervenor.  With him on the briefs were Brian G. Walsh and Cara L. Lasley, Wiley Rein LLP, Washington, D.C.

**OPINION AND ORDER[1]**

LETTOW, Senior Judge.

---

[1] Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information.  No redactions were requested.

1

Plaintiff Alaska Structures, Inc. ("Alaska Structures") protests the decision of the United States Air Force to award a contract to California Industrial Facilities Resources, Inc. d/b/a CAMSS Shelters ("CAMSS"). The procurement involves 10 canvass Quonset-shaped shelters ("shelters") requested for winter use by Joint Base Elmendorf-Richardson in Alaska. The procurement was conducted under the Federal Acquisition Regulation ("FAR") as a FAR Part 12 commercial items procurement using Part 12 and 13 streamlined acquisition procedures. The Air Force's requirements for what needed to be in a bid were correspondingly limited in scope.

The United States (the "government") filed the administrative record on June 14, 2019. ECF No. 26.[2] Pending before the court is Alaska Structures' motion to complete the record. *See* Mem. of Law in Supp. of Pl.'s Mot. to Complete the Admin. Record ("Pl.'s Mem. to Complete"), ECF No. 20-1. Alaska Structures seeks the addition to the record of an initial test report regarding snow-load testing of the shelter model proposed by CAMSS. *Id.* at 14. Though the Air Force did not have this documentation in hand when considering the procurement, Alaska Structures argues that these test results should have been part of the record because the solicitation required CAMSS to provide, and the Air Force to consider, the test results. *Id.* at 7. Alternatively, Alaska Structure argues that these test results bear upon whether CAMSS' shelters comply with the snow-load performance requirement in its bid. *Id.* at 11. CAMSS and the government responded in opposition. Mem. in Supp. of [CAMSS'] Opp'n to the Mot. to Complete the Admin. Record ("CAMSS' Opp'n"), ECF No. 24-2; Def.'s Resp. to Pl.'s Mot. to Complete the Admin. Record or Conduct Disc. ("Def.'s Opp'n"), ECF No. 25; *see also* [Pl.'s] Reply in Supp. of its Mot. to Complete the Admin. Record ("Pl.'s Reply"), ECF No. 28.

The court concludes that the test reports are necessary for the court to evaluate Alaska Structures' claim that CAMSS' bid was or was not compliant with the solicitation's snow load requirements, a claim for which there is a sufficient basis to warrant further inquiry. Accordingly, Alaska Structures' motion to complete the administrative record is GRANTED in part and DENIED in part. The government or CAMSS shall produce the initial test report showing snow load performance of the shelter proposed by CAMSS on or before July 17, 2019, as a supplement to the record and not as a correction to the record.

## FACTS[3]

On December 3, 2018, the Air Force issued a request for quotes for 10 Alaska Small Shelter Systems, product number AK-V280, or equivalent (the "solicitation"). AR 8-48 (Contracting Officer's statement); *see also* AR 16-89 to 90, 93 (solicitation). The Alaska Small Shelter System represented a brand name for the requested shelter as produced by Alaska Structures. *Compare* AR 12-73 (Alaska Structures' bid), *with* AR 16-93 (solicitation). The Air Force awarded the contract to CAMSS on March 27, 2019, AR 23-112 (contract), and publicly

---

[2]The administrative record contains 188 consecutively-number pages divided into 34 tabs. Citations to the record cite to the tab and page, as "AR [tab]-[page]" (*e.g.*, AR 10-61).

[3]The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

announced its award decision two days later, AR 24-132. CAMSS did not offer the brand-name shelter produced by Alaska Structures, but rather the CAMSS20QSA model shelter of its own manufacture. AR 18-98 to 99.

Pertinent to the pending motion, one minimum requirement specified by the solicitation was for the shelter to "meet at least 20 psf [pounds per square foot] ground snow load." AR 16-94 (minimum requirements). CAMSS represented that its equivalent shelter model, product CAMSS20QSA, "[met] all of the salient characteristics," AR 18-97, and relevant to the motion, affirmed that its shelter would "meet at least 20 psf ground snow load," AR 18-99, and "met [Army] Test Operational Procedure (TOP) 10-2-175 . . . 20 psf snow load test (per initial test)," AR 18-102.[4] CAMSS' proposal did not include the referenced tests. *See generally* AR 18-97 to 102 (CAMSS bid); AR 6-42 (Air Force responses to Alaska Structures' questions during GAO protest, stating "[n]o [snow load] test reports were received."); *see also* CAMSS' Opp'n at 1 ("no dispute that CAMSS did not submit any snow load test reports").

CAMSS maintains a publicly-available technical specification sheet for its CAMSS20Q shelter system for commercial sales. AR 2-19.[5] These technical specifications represent that the CAMSS20Q shelter met "snow load *testing* [at] 10 PSF for 24 hours" and was "*engineered* to 20 PSF snow load." AR 2-19 (capitalization removed, emphasis added). CAMSS did not supply this technical specification sheet with its proposal, and it only appears in the record because it was appended to Alaska Structures' prior, superseded complaint before the Government Accountability Office ("GAO").[6] There is no evidence that the Air Force reviewed anything other than the technical details provided by CAMSS in its bid. It is not apparent how the CAMSS20QSA model differs from the CAMSS20Q system.

The Air Force requires these shelters for an exercise in Alaska scheduled for October 2019. Hr'g Tr. at 11:11-25 (June 3, 2019). Due to the time needed for delivery and setup, the government has requested a ruling on this bid protest by August 2, 2019. Hr'g Tr. at 11:15-25. Thus, the ruling on the pending motion is being issued on an expedited basis, during the briefing of the merits of this bid protest.

## ANALYSIS

Alaska Structures requests production of the initial tests that CAMSS represented it conducted and that showed its shelters could support a snow load of 20 PSF. Alaska Structures further argues that the solicitation required production of such tests. *See* Pl.'s Mem. to Complete

---

[4]The government's test procedure 10-2-175 is specifically designed to test shelters such as the ones at issue in this procurement.

[5]CAMMS' commercial product is designated as CAMSS20Q. The "20" in the designation refers to the fact that the shelter is 20 feet wide, and the "Q" indicates that the model is a Quonset-type shelter. Pl.'s Reply at 9.

[6]Alaska Structures initially filed its protest before GAO. AR 2-3. As part of a supplemental protest filed with GAO, Alaska Structures sought production of the test results at issue. AR 5-38 to 39. Ultimately, GAO denied Alaska Structures' request, and Alaska Structures responded by filing its protest in this court, thus obviating a decision by GAO on the merits.

3

at 5-10. Alternatively, Alaska Structures argues that representations about test results in CAMSS' bid do not align with the publicly-available product literature, which states that the shelter was engineered to 20 PSF, but tested at 10 PSF. *Id*. at 10-13 (quoting AR 2-19, which states "Snow Load testing with 10 PSF for 24 hours (Engineering to 20 PSF Snow Load).").

Reference to commercial product literature is appropriate in "Streamlined Procedures for Evaluation and Solicitation for Commercial Items." FAR Subpt. 12.6 (heading). FAR § 12.602 explicitly provides that "[a] technical evaluation would normally include examination of such things as product literature, product samples (if requested), technical features[,] and warranty provisions." FAR 12.602(b). Nonetheless, the evaluation of the bids in this instance proceeded on a very expedited basis, *see* Pl. Alaska Structures, Inc.'s Mem. of Law in Supp. of its Mot. for Judgment on the Admin. Record at 18-20, ECF No. 29-1, to the point that the evaluators initially apparently reached a decision without having seen the solicitation's minimum specifications, *id*. at 20; *see also* AR 20-106 to 108 (evaluation process), let alone not having made a check of product literature.

CAMSS argues that the evidence offered by Alaska Structures fails to warrant production of the test results. CAMSS suggests that the product literature pertains to the CAMSS20Q shelter system, whereas it proposed the CAMSS20QSA model, and "CAMSS could have easily made variations [for] the Air Force and conducted an initial snow load test of 20 PSF." CAMSS' Opp'n at 7-8. CAMSS also argues that Alaska Structures engages in unfounded speculation by arguing that CAMSS would not understate performance in publicized product literature. *Id*. at 8.

"As material, intentional misrepresentations taint the award process, prevent government officials from determining the best value to the government[,] and retard the competitive bidding process, an offeror who is found to have made such a misrepresentation will lose its right to execute the solicited work or bid on the reprocurement of the contract." *Algese 2 S.c.a.r.l. v. United States*, 125 Fed. Cl. 431, 440 (2016) (quoting *Microdyne Outsourcing, Inc., v. United States*, 72 Fed. Cl. 230, 233 (2006)) (internal quotations omitted). A material misrepresentation exists when a bidder makes an incorrect statement upon which the procuring agency relies in awarding the contract. *See, e.g.*, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1317 (Fed. Cir. 2007); *Supreme Foodserv. GmbH v. United States*, 112 Fed. Cl. 402, 425 (2013); *Bannum, Inc. v. United States*, 119 Fed. Cl. 291, 307 (2014) (collecting cases), *aff'd*, 616 Fed. Appx. 420 (Fed. Cir. 2015) (per curiam). The bidder must also intend the incorrect statement. *E.g.*, *Supreme Foodserv.*, 112 Fed. Cl. at 425; *Bannum, Inc.*, 119 Fed. Cl. at 307; *but see Canpro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 343 (2017) (finding in a contract dispute that allegations of government misrepresentation, unlike fraud, did not require showing intent); *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 483, 486 (2012) (not listing intent among elements for misrepresentation by a bidder in a post-award bid protest).

CAMSS' snow load performance representation was material. Ability to remain intact under a 20 PSF ground snow load appeared as a "minimum specification[]." AR 16-94 (emphasis removed). Meeting this requirement during initial testing obviated the need to provide third-party, and perhaps any, test reports. AR 16-95. CAMSS' proposal did not include third-party tests. *See generally* AR 18-97 to 102 (CAMSS' bid); AR 6-42 (Air Force stating that "[n]o test reports were received"). Accordingly, if CAMSS' shelter could not withstand a snow load of 20 PSF or if initial tests did not confirm this, CAMSS' proposal offered either a technically unacceptable shelter or a defective proposal, respectively. CAMSS' statement to the contrary would constitute a materially incorrect representation. Further, it is hard to conceive of the

4

differing representations being inadvertent.  Either the initial test occurred, or it did not.  And either the shelter withstood a 20 PSF snow load during the initial test, or it did not.

The court, however, cannot determine on the record whether CAMSS failed to accurately represent the test results.  CAMSS' snow load testing representation in its CAMSS20Q shelter system product literature differs from the comparable representation in its bid for the CAMSS20QSA model.  Both are part of the CAMSS20Q shelter system product line, and thus it is plausible to argue that representations for the commercially-available models would also apply to the model proposed to the Air Force.  But the statements in the bid and the product literature are not necessarily mutually exclusive.  As CAMSS suggests, the CAMSS20QSA model could be a variant produced for the military and could have undergone a different initial test than the standard CAMSS20Q system.  *See* CAMSS' Opp'n at 8.  Or, perhaps CAMSS understated performance in its product literature to limit the extent of its shelter's commercial warranty.  CAMSS' product literature thus does not directly contradict its proposal.  And even if one of the representations is inaccurate, the court cannot determine on the record which one.  The issue, then, is whether CAMSS' differing representations suffice to warrant production of the initial test report to confirm the proposal's representation of snow load performance.

"A court may authorize discovery in a bid protest 'if necessary for effective judicial review' or if the existing 'record cannot be trusted.'" *Diversified Maint. Sys., Inc. v. United States*, 93 Fed. Cl. 794, 802 (2010) (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009)) (subsequent quotations omitted).  A party in a bid protest may seek through discovery "'relevant information that by its very nature would not be found in an agency record.'" *L–3 Commc'ns. Integrated Sys., L.P. v. United States,* 91 Fed. Cl. 347, 354 (2010) (quoting *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004)).  Evidence of an inaccurate representation falls within that category.  *See Diversified Maint. Sys.*, 93 Fed. Cl. at 803-04 (allowing discovery to confirm representations by the awardee that its primary place of business was within a HUBZone where the administrative record contained multiple addresses for the awardee).  At the same time, supplementation of the record should be very narrowly confined, *e.g.*, *Axiom*, 564 F.3d at 1379-80, and the court must guard against unsupported or speculative claims of inaccurate representations being used to circumvent limits on supplementation.  But how much support for the inaccurate representation theory does *Axiom* require Alaska Structures to provide to permit the limited discovery sought?

Alaska Structures must adduce something more than allegations of counsel.  *Cf. Terry v. United States*, 96 Fed. Cl. 156, 164 (2010) ("'Innuendo or suspicion is not enough'" to justify discovery for allegations of agency bias or bad faith.) (quoting *Orion*, 60 Fed. Cl. at 344); *Office Depot, Inc. v. United States*, 94 Fed. Cl. 294, 297-98 (2010) (collecting cases that indicate bias or bad faith by procurement officials must be shown with "strong" or "sufficiently well grounded" evidence).  Even so, the discovery threshold must be less than showing an actual misrepresentation within the record, which would obviate the need for further discovery.  In between these endpoints fall inconsistencies, *i.e.*, where different representations may conflict but could also both be true, and contradictions where one representation must be inaccurate but it is not apparent which one.  While the court has not explored explicitly the benchmarks within this range, several cases involving misrepresentation allegations in post-award bid protests are helpful.

*Algese*, 125 Fed. Cl. 431, presents an example of explicit falsity.  In *Algese*, the awardee certified that neither it nor any of its principal officers had been convicted in a case relating to a

5

federal contract or grants in the past five years, despite extensive extrinsic evidence to the contrary. *Id.* at 435-37, 440-41. The court enjoined performance on that basis. *Id.* at 445.

*Diversified Maintenance Systems*, 93 Fed. Cl. 794, provides an example of contradictory representations, where the court could not determine without discovery which representation was correct. The solicitation included a HUBZone set-aside, and the post-award protest challenged whether the awardee had its principal office in a HUBZone. *Id.* at 796. As the court stated, "[t]o put it mildly, there is much confusion in the current record as to where, in fact, [awardee's] principal place of business was located at the [relevant time]." *Id.* Prior to the solicitation, the Small Business Administration ("SBA") proposed to decertify the awardee's HUBZone status based on the same non-HUBZone address provided in the proposal. *Id.* at 796-97. The awardee, however, represented a different HUBZone address to SBA during the inquiry process. *Id.* at 798. The agency awarded the contract before the SBA issued a final determination, and the SBA abandoned the decertification process in light of a protest. *Id.* at 797. During the pendency of the protest, the awardee submitted copies of two leases showing two other HUBZone addresses, with the change of address occurring between the bid and award. *Id.* at 799. While the court described the differing representations as inconsistencies, only one principal place of business could exist at any given time, and thus providing more than one address would create a contradiction. *Id.* at 805. The protestor sought to supplement the record with affidavits of the lessors of the awardee's offices and a yet-to be taken deposition of the awardee's Vice President to determine where the awardee was located during the relevant time. *Id.* at 796, 801-02. The court rejected that supplementation but granted limited discovery generally as the protestor requested. *Id.* at 806.

*GTA Containers* presents another example of inconsistent representations, and where the evidence only came to the agency's attention post-award. The awardee's proposal listed a certain company as a past supplier of relevant parts in its past performance section. *GTA Containers*, 103 Fed. Cl. at 476, 484. A disappointed bidder's pending protest caused the agency to take the corrective action of requesting a size determination of the awardee by the SBA. *Id.* at 476-77. In response to the SBA's review, the awardee represented that it would not use the company listed in its proposal as a parts supplier, but only for technical advice if needed. *Id.* at 477, 485. The SBA's investigation found contrary evidence when assessing the awardee's proposal. *Id.* But the agency accepted the awardee's explanation that its listing of the company as a supplier only meant that it would "supply" technical assistance and given the awardee's facial representations that it would comply with all terms, the evidence "does not lead to the conclusion that [awardee] will not or cannot comply." *Id.* at 477. The court did not accept the agency's rationale and enjoined the award, rejecting the awardee's post-award explanation of why it included the specific company in its bid given the context of its inclusion and finding it "inconceivable" that the company would act merely as a technical advisor absent any contractual or legal relationship to the awardee. *Id.* at 485.

Comparing the cases yields two salient points. First, in both *Algese* and *GTA Containers*, the court's finding of inaccurate representations relied on evidence extrinsic to the award decision. Supplementation was not at issue in either case because evidence sufficient for the court to make its determination was presented to the contracting officers during the post-award review of the award decisions. But the evidence was obtained post-award, and only because the award decision was contested. Timing should not be the standard for supplementation, especially when the potential for an inaccurate representation will often not be evident on the face of the record, a record which a protestor would not see until after commencing a protest. In

*Diversified Maintenance Systems*, evidence extrinsic to the award decision provided the basis for supplementation. Second, factual context matters. Inconsistencies may suffice for finding inaccurate representation, as in *GTA Containers* and *Diversified Maintenance Systems*, and thus explicit contradiction should not be required to grant discovery.

This case provides an example of an inconsistency that cannot be resolved on the face of the existing record. As noted, absent contradiction and with an inconsistency of a lesser degree than that of *GTA Containers*, the record does not facially show misrepresentation. But the inconsistency between the bid and product literature does make plausible the inaccurate representation claim. Contrary to CAMSS' assertion, Alaska Structures' motion relies on "more than statements of counsel." *See* CAMSS' Opp'n at 8. It relies on CAMSS' product literature for a shelter system that plausibly appears to encompass the model proposed by CAMSS. While the differing representations may be readily explicable, the difference is sufficiently evident on its face to require explanation. Accordingly, resolution of the inaccurate representation claim requires production of the initial test reports.

This dispute is not a "matter of contract administration." Def.'s Opp'n at 19. There is a difference between an awardee who intends to perform but fails, and an awardee who fails to bid in accordance with the solicitation. Bidders are allowed to make aggressive proposals at their own risk, but not representations that are inaccurate when made. While the Air Force is entitled to rely on representations in bids, "it is irrelevant [to an inaccurate representation claim] that [the] proposal was facially acceptable [because it] is axiomatic that . . . an agency would not make an award based on a patently obvious misrepresentation." *GTA Containers*, 103 Fed. Cl. at 483-84.

In sum, CAMSS' bid may be fully compliant with the solicitation's requirements, or not. The court cannot tell which is correct based on the current record.

## CONCLUSION

For the foregoing reasons, Alaska Structures' motion to complete the administrative record is GRANTED in part and DENIED in part. The government or CAMSS shall produce by July 17, 2019, the initial test report showing snow load performance of the shelter proposed by CAMSS, but as a supplement to the record and not as a correction to the record.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge